UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-1453(DSD/SRN)

Prestige Hospitality Group, Inc.,

Plaintiff,

**ORDER**

v.

Flagship Services Corporation,
Richard Abati and Rick Newman,

Defendants.

Leny K. Wallen-Friedman, Esq. and Wallen-Friedman Law Office, 527 Marquette Avenue, Suite 860, Minneapolis, MN 55402, counsel for plaintiff.

Charles B. Rogers, Esq., Matthew Forsgren, Esq. and Briggs & Morgan, 2400 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for defendants.

This matter is before the court on defendants' motion to dismiss the complaint for lack of personal jurisdiction and improper venue or in the alternative to transfer. Based on a review of the file, record, and proceedings herein, the court denies the motion.

**BACKGROUND**

Plaintiff Prestige Hospitality Group, Inc. ("Prestige") is a Minnesota corporation in the hospitality services and training business. Prestige provides marketing, group sales and booking

FILED FEB 27 2001
FRANCIS E. DOSAL, CLERK
Judgment Ent'd. ________
Deputy Clerk's Initials ______

services for resort hotels as well as consulting services to the members of the hotel industry. Blair McKeever, a Minnesota resident, is the president and one of the shareholders of Prestige.[1]

Defendant Flagship Services Corporation ("Flagship") is a Puerto Rico corporation and hotel management operation based in San Juan, Puerto Rico. Defendants Richard Abati (Abati) and Rick Newman (Newman) are the sole officers, directors and employees of Flagship.[2] The record reflects that Abati and Newman have worked together in hotel management since at least 1991, when Abati was hired as vice president and managing director and Newman was hired as the vice president of operations for the Sands Hotel and Casino Beach Resort in San Juan, Puerto Rico.

McKeever first met Abati in 1977 and has worked with Abati on numerous hotel and travel industry projects, both individually and through Prestige. The parties agree that this lawsuit involves at least one of these projects. However, nearly every other aspect of their joint efforts is in dispute, including the nature of their business relationship and whether to categorize the relevant events

---

[1] From 1986 through May 1999, McKeever was Prestige's sole shareholder. In May 1999, McKeever obtained an ownership interest in Discover Resorts, Inc. and Prestige became a wholly-owned subsidiary of Discover. Prestige still maintains its principal place of business in Minnesota, where it employs nine people.

[2] Although the court will refer to Abati in the present tense throughout this order, the court has been advised that Abati passed away in January 2001.

and activities as part of the same project or as part of discrete and unrelated projects. The court has not conducted an evidentiary hearing therefore for purposes of this motion, the court will adopt plaintiff's version of the facts, which is as follows:

In 1995, Abati and Newman learned that the Sands Hotel was to be sold. In 1996, Abati and Newman approached McKeever and proposed a partnership between the three men. The partnership would identify suitable hotels for purchase, promote the purchase to an investor, then obtain the management and marketing contract for the hotel. Abati and Newman would provide the hotel management expertise and McKeever would provide the sales and marketing experience. Negotiations regarding the partnership occurred primarily by telephone and mail, with approximately 10 telephone calls and 3-5 letters exchanged between McKeever in Minnesota and Abati and Newman in Puerto Rico.

McKeever, on behalf of Prestige, agreed to work with Abati and Newman under the Flagship name in exchange for 15 percent of all fees earned by Flagship on the Sands project and 25 percent of management fees earned on any other joint project. McKeever would be paid $6,000 monthly, with a year-end reconciliation for any amount due above this monthly payment. McKeever was given his own business cards listing him individually under the name of Flagship. Abati and Newman later provided McKeever with Flagship business cards that listed McKeever's name and Prestige's Minnesota address

on the cards. (McKeever Aff., Exh. A]. Abati and Newman also created an advertising brochure which described Flagship has having a division know as "Prestige Resorts & Hotels, Ltd.," which is a business name used by Prestige. [Id., Exh. B].

In the summer of 1997, Flagship located a buyer for the Sands Hotel. McKeever estimates that during this period, there were ten communications per week between the hotel, Abati, Newman and Prestige's Minnesota office. Prestige representatives also attended meetings in New York and Puerto Rico, where Abati and Newman introduced Prestige as the Flagship "partner" responsible for sales and marketing. [Complaint ¶ 17]. The buyer eventually hired Flagship to renovate and manage the hotel. The management agreement provided that Flagship would be paid a fixed yearly management fee with a bonus based on the hotel's ability to meet specified revenue and profit targets. [Id. at ¶ 18].

For the next six to eight months, Abati and Newman concentrated on the renovation, while Prestige worked primarily out of Minnesota to find a major hotel group with which the Sands could affiliate. In autumn 1997, the Sands Hotel was renamed the San Juan Grand Beach Resort and Casino ("San Juan Grand") and in early 1998, the hotel affiliated with Preferred Hotel and Resorts.

In spring 1998, the San Juan Grand opened for business. To facilitate bookings for the hotel, Flagship established a national sales office in Prestige's Minnesota office, which is referred to

in Flagship's 1999-2000 Strategic Marketing Plan for the hotel. [McKeever Aff., Exh. C]. Flagship also sent sales executives and hotel staff members to Minnesota to work with Prestige staff to solicit bookings. McKeever estimates there was an average of one or more telephone communications per day between the Prestige office in Minnesota and either Abati, Newman or the hotel employees directed by Abati and Newman. [McKeever Aff., ¶ 22, Exh. D]. On average, McKeever spoke from Minnesota with Abati once a week and with Newman once every three to four weeks during 1998 and 1999. [Id. at ¶ 23]. In addition, McKeever estimates that 40 to 50 letters were sent to and from Minnesota regarding marketing and advertising of the San Juan Grand from early 1998 through early 2000. [Id. at ¶ 24].

Prestige provided information on the hotel at its annual hotel and travel industry trade shows in Minnesota in both 1999 and 2000. Prestige also called on Minnesota corporations to solicit group bookings at the hotel. McKeever asserts that he used his Flagship business cards on these sales calls. [Id. at ¶ 26].

By late 1999, relations between Flagship and Prestige soured, which Flagship attributes to the demands placed on McKeever in his new role at Discover Resorts and his subsequent failure to seek out new business opportunities for the Flagship partnership. [Abati Aff., ¶ 19]. By letter dated January 7, 2000, Flagship terminated the oral agreement with Prestige. Prestige initiated this lawsuit

against Flagship, Abati and Newman for breach of contract, seeking its 15 percent share of the estimated $1,700,000 bonus that Flagship received on the management contract with the San Juan Grand in 1999. [Id. at ¶ 29]. Defendants move to dismiss the case for lack of jurisdiction. In the alternative, defendants argue that the complaint should be dismissed for improper venue or transferred to Puerto Rico in the interest of justice and the convenience of the parties and witnesses.

**DISCUSSION**

**I. Jurisdiction**

To defeat a motion to dismiss for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), plaintiff need only "make out a prima facie showing of jurisdiction." Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). In deciding whether plaintiff has met his burden, the court "must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor." Digi-Tel Holdings, Inc. v. Proteq Telecommunications, Ltd., 89 F.3d 519, 522 (8th Cir. 1996).

A federal court in Minnesota may exercise personal jurisdiction over a nonresident defendant if: (1) the facts presented satisfy the requirements of the Minnesota long arm statute, Minn. Stat. Ann. § 543.19, and (2) the exercise of

personal jurisdiction does not offend due process. See Wessels, Arnold & Henderson v. National Med. Waste, Inc., 65 F.3d 1427, 1431 (8th Cir. 1995). However, because Minnesota's long arm statute has been interpreted to confer personal jurisdiction over nonresident defendants to the fullest extent consistent with due process, the court need only evaluate whether the exercise of personal jurisdiction would offend due process. See id.

To determine if the requirements of due process are satisfied, the court must first decide whether plaintiff has shown that defendant has maintained "minimum contacts" with Minnesota such that it "should reasonably anticipate being haled into court there." Id. at 1432. The contacts with the forum state may not be random, fortuitous or attenuated. See Guinness Import Co. v. Mark II Distribs., Inc., 153 F.3d 607, 614 (8th Cir. 1998). Rather, it is imperative that "there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

"Once it has been decided that a defendant purposefully established contacts with a forum state, these contacts must be considered in light of other factors to determine whether the assertion of personal jurisdiction would agree with fair play and

substantial justice." Minnesota Mining & Mfg., Inc. v. Nippon Carbide Indus. Co., 63 F.3d 694, 697 (8th Cir. 1995), cert. denied, 516 U.S. 1184 (1996) (citing International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Therefore, "[e]ven if the defendant has purposefully established the necessary 'minimum contacts' within the forum State, consideration of 'fair play and substantial justice' may nevertheless defeat the reasonableness of jurisdiction." Sybartic, Inc. v. Interport Intern, Inc., 957 F.2d 522, 524 (8th Cir. 1992) (citing Burger King, 471 U.S. at 476-78).

Relying on those principles, the Eighth Circuit has established a five-part test, under which the court must consider: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. See Land-O-Nod Co. v. Bassett Furniture Indus., 708 F.2d 1338, 1340 (8th Cir. 1983); Sybartic, 957 F.2d at 524 (noting that [t]his analytical framework incorporates the notions of both 'minimum contacts' and 'fair play and substantial justice.'"). The court affords the greatest weight to the first three factors in its jurisdictional analysis. See Digi-Tel, 89 F.3d at 522-23.

Defendants concede in this case that substantial business activity has occurred in Minnesota. However, defendants argue that

Prestige conducted this activity pursuant to its own marketing contract with the San Juan Grand Hotel, not as part of an alleged partnership between McKeever, Abati and Newman. Thus, according to defendants, Prestige improperly relies on its own group sales activity to create the appearance of personal jurisdiction over defendants. Prestige rejects defendants attempt to separate Prestige's business activity into unrelated units and argues that Flagship, through its partnership with Prestige, has engaged in substantial purposeful contacts with Minnesota which fully support a finding of personal jurisdiction over defendants. As the parties' arguments evince, the question of whether this court has jurisdiction over defendants is intertwined with the resolution of factual issues going to the merits of Prestige's claims.

A court approaches a factual dispute under Rule 12(b)(2) in the same manner as it would approach a factual dispute in a summary judgment motion. As the Eighth Circuit discussed in Radaszewski v. Telecom Corp., 981 F.2d 305 (8th Cir. 1992):

> [I]n Aaron Ferer & Sons Co. v. Diversified Metals Corp., 564 F.2d 1211, 1215 (8th Cir. 1977), we said: 'While the facts adduced in a Rule 12(b)(2) Motion to Dismiss for lack of personal jurisdiction must be viewed in the light most favorable to the party opposing the motion, there must nonetheless be some evidence upon which a prima facie showing of jurisdiction may be found to exist, thereby casting the burden upon the moving party to demonstrate a lack of personal jurisdiction.'

> This is the same standard as the one we apply on motions for summary judgment under Rule 56. We look at the facts in the light most favorable to the party opposing the motion, give him the benefit of all reasonable inferences, and grant the motion only if there is no genuine issue as to any material fact, so that the moving party is entitled to judgment as a matter of law. So here, though the motion is captioned under Rule 12(b)(2) rather than under Rule 56, the analytical process is the same as that used on a motion for summary judgment. We look at the facts relevant to the issue of jurisdiction in the light most favorable to [plaintiff], give him the benefit of all reasonable inferences from these facts, and deny the motion to dismiss if the record, viewed in this way, raises any genuine issue of fact material to the issue of jurisdiction.

Radaszewski, 981 F.2d at 310.

Applying this standard to the instant case, Prestige has clearly made a prima facie showing of jurisdiction. Defendants engaged in numerous mail and telephone contacts with Minnesota through which the alleged partnership was formed, then utilized Prestige's Minnesota offices over a two-year period to solicit business both within and outside of Minnesota. As the exhibits reflect, defendants printed business cards for Prestige's sole shareholder listing him under the name of Flagship Services Corporation, located at the Minnesota address. [McKeever Aff., Exh. A]. In its advertising materials, defendants referred to "Prestige Resorts & Hotels, Ltd." as a "division" of Flagship, with "production offices" across the country. [McKeever Aff., Exh. B]. Similarly, in a strategic marketing plan designed for the San Juan

Grand hotel, defendants indicated that "national sales" efforts for the hotel would be directed from Flagship's "Minnesota Office." [McKeever Aff., Exh. C]. As part of those efforts, Abati, Newman and the hotel employees they directed communicated by mail and telephone with Prestige's Minnesota office on a daily basis. Abati and Newman also sent at least four members of the hotel's sales staff to Minnesota to work directly with the Prestige staff in marketing the hotel.

Defendants contend that Prestige and the hotel employees engaged in these sales efforts pursuant to a contract that Prestige negotiated directly with the San Juan Grand. Therefore, defendants argue that the contacts with Minnesota bear no relation to a purported partnership agreement between Prestige and Flagship. However, the court again emphasizes that Prestige was represented in Flagship's own advertising materials as a marketing division of Flagship and Prestige's earnings were purportedly based on Flagship's ability to meet hotel revenue targets. Thus, even assuming the existence of a separate contract between Prestige and the hotel, any sales activity conducted out of Prestige's Minnesota office on behalf of the San Juan Grand Hotel is inextricably linked to Prestige's claim that Flagship owes it additional money under the partnership's profit sharing arrangement.

Accordingly, after the viewing the factual assertions in a light most favorable to Prestige, the court finds that the nature,

quantity, and quality of defendants' contacts with Minnesota and the relationship of those contacts to the Prestige's claim are sufficient to confer personal specific jurisdiction over defendants. See, e.g., Wessels, 65 F.3d at 1433-34 (finding personal specific jurisdiction existed where defendant pursued business relationship with plaintiff in the forum state, the majority of the work required under the contract was performed in the forum state and a visit to the forum state by corporate director and business associate "enriched the relationship and contract between the parties"). Therefore, defendants' motion to dismiss is denied.

**II. Venue**

Title 28 of the United States Code, Section 1391(a)(3) provides that a diversity case may be brought in a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced. Based on the court's finding that personal jurisdiction exists over defendants, venue is proper in Minnesota. Moreover, because "a substantial part of the events or omissions giving rise to the claim occurred" in Minnesota, venue in this judicial district is appropriate.[3] 28 U.S.C. § 1391(a)(2).

---

[3] Defendants suggest that because the San Juan Grand Hotel is located in Puerto Rico and McKeever made several trips to Puerto Rico to fulfill its obligations under the purported partnership agreement, venue in Puerto Rico is proper. Defendants overlook that a majority of the work done by Prestige on behalf of the alleged partnership was completed primarily in Minnesota, where (continued...)

Accordingly, defendants' motion to dismiss for improper venue is denied.

**III. Motion to Transfer**

In the alternative, defendants move for a transfer of venue to Puerto Rico pursuant to 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." To prevail on a transfer motion, defendant must overcome the presumption in favor of plaintiff's choice of forum. See United Mortgage Co. v. Plaza Mortgage Co., 853 F. Supp. 311, 314 (D. Minn. 1994). Moreover, defendant must show that his inconvenience "substantially outweighs" the inconvenience that plaintiff would suffer if venue were transferred. Nelson v. Soo Line Railroad Co., 58 F. Supp. 2d 1023, 1026 (D. Minn. 1999).

With respect to the convenience of the parties, defendants assert that it would be a hardship to travel to Minnesota to defend themselves, whereas McKeever could easily travel to Puerto Rico, as he has done in the past. If the court were to transfer the case on this basis, the effect would be merely to shift the inconvenience of travel from one party to the other. Such a shift is impermissible in light of the presumption favoring plaintiff's

---

[3](...continued)
Prestige's home office and Flagship's "national sales" office were located.

chosen forum. See Norval Indus., Inc. v. Superior Cos., 515 F. Supp. 895, 899 (D. Minn. 1981).

With regard to the convenience of the witnesses, the court has no doubt that a number of potential witnesses hale from Puerto Rico. However, given that other key witnesses are located across the United States, including New York, Florida and Minnesota, the mere presence of Puerto Rican witnesses does not justify transfer of this case to Puerto Rico. To the contrary, a mainland location would better serve the amalgam of witnesses traveling from various locations around the country to testify at trial.

The court is aware of no other reason "in the interest of justice" that would compel a transfer pursuant to 28 U.S.C. § 1404(a), therefore defendants' motion to transfer is denied.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that: defendants' motion to dismiss plaintiff's complaint or in the alternative for change of venue or transfer is denied.

Dated: February 27, 2001

David S. Doty, Judge
United States District Court